IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRANK OLIVER, JR. et al.,<br><br>             Plaintiffs,<br><br>    v.<br><br>REBECCA RHYNHART,<br><br>             Defendant. | CIVIL ACTION<br>NO. 18-279 |

## OPINION

**Slomsky, J.**                                                        **August 21, 2019**

## I.    INTRODUCTION

In May of 2017, Defendant Rebecca Rhynhart won the Democratic Primary for City Controller of the City of Philadelphia, defeating incumbent Alan Butkovitz. During her campaign, she pledged to reduce unnecessary spending in the City Controller's Office ("the Office") and claimed that she would not cater to the Democratic "Political Machine." After winning the General Election in November of 2017, Ms. Rhynhart assembled a Transition Team, which was tasked with assessing the needs of the Office and reorganizing it to cut costs. She also created a Personnel Committee, which was responsible for downsizing the Office and evaluating applicants and existing employees for positions in the Office.

In December 2017, the Personnel Committee decided to terminate the employment of a number of employees, including Plaintiffs Frank Oliver, Jr., Lopez Jones, and Lisa Plaza ("Plaintiffs"). All three Plaintiffs are related to individuals that have long held positions of power in the Philadelphia Democratic Party and are considered to be part of the "Political Machine."

After being fired, each Plaintiff filed a separate Complaint in federal court. (See Doc. Nos. 13-2, 13-3, 13-4.) Mr. Oliver's Complaint, which was filed on January 23, 2018 pursuant to 42 U.S.C. § 1983,[1] alleges that Ms. Rhynhart fired Mr. Oliver "because of his political affiliation" in violation of the First Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment.[2] (Doc. No. 13-2 ¶¶ 22-23.) Mr. Jones' Complaint, which was filed on February 15, 2018 pursuant to 42 U.S.C. § 1983, similarly alleges that Ms. Rhynhart fired him because of his political affiliation in violation of the First Amendment.[3] (Doc. No. 13-3 ¶¶ 22-24.) Ms. Plaza also filed her Complaint on February 15, 2018. Like Mr. Oliver and Mr. Jones, Ms. Plaza claims that Ms. Rhynhart violated her First Amendment rights by firing her as a result of her political affiliation.[4] Her lawsuit is also brought pursuant to 42 U.S.C. § 1983. In essence, Plaintiffs contend that they were terminated because they are related to members of the "Political Machine."

On April 13, 2018, Ms. Rhynhart filed an unopposed Motion to Consolidate the three lawsuits (Doc. No. 4), which the Court granted on April 13, 2018 (Doc. No. 5). On May 23,

---

[1]  42 U.S.C. § 1983, which is discussed infra, provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

[2]  Mr. Oliver's lawsuit is captioned as Oliver v. Rhynhart, Civ. No. 18-279 (E.D. Pa., filed Jan. 23, 2018).

[3]  Mr. Jones' lawsuit is captioned as Jones v. Rhynhart, Civ. No. 18-658 (E.D. Pa., filed Feb. 15, 2018).

[4]  Ms. Plaza's lawsuit is captioned as Plaza v. Rhynhart, Civ. No. 18-659 (E.D. Pa., filed Feb. 15, 2018).

2019, Ms. Rhynhart filed the present Motion for Summary Judgment. (Doc. No. 13.) On June 20, 2019, Plaintiffs collectively filed a Response in Opposition to the Motion for Summary Judgment. (Doc. No. 14.) Finally, on July 3, 2019, Ms. Rhynhart filed a Reply in Further Support of the Motion for Summary Judgment. (Doc. No. 18.)

Ms. Rhynhart's Motion for Summary Judgment (Doc. No. 13) is now ripe for disposition. For the reasons discussed <u>infra</u>, the Motion for Summary Judgment will be granted, and the Court will grant judgment in Ms. Rhynhart's favor.

## II. BACKGROUND

### A. Factual Background

In the Spring of 2017, Defendant Rebecca Rhynhart,[5] a Democrat, challenged incumbent Alan Butkovitz, another Democrat, for the position of City Controller of the City of Philadelphia. As part of her campaign platform, Ms. Rhynhart "pledged to audit every City department, save the City money by focusing on best practices and modernization, commission an outside audit of the Controller's Officer to ensure the office is operating efficiently, improve the pension fund's return on investment, increase the diversity of the city's workforce, audit the Philadelphia Parking Authority, and increase transparency in city government." (Doc. No. 13-1 ¶ 9.)

Ms. Rhynhart's campaign platform was tied to her pledge to rebuke the "status quo" and not be beholden to the "Political Machine." (<u>Id.</u> ¶ 93.) According to Ms. Rhynhart, the Political Machine is not about individual people or individual ward leaders, although they may be a part of it; rather, the term refers to the "entrenched powers of the City," entrenched interests, and the way things have always been done in City government. (<u>Id.</u> ¶¶ 90-91, 96.) As part of her effort to increase government transparency, Ms. Rhynhart promised that, if elected, she would not cater

---

[5] Prior to running for City Controller, Ms. Rhynhart served as the Chief Administration Officer for Philadelphia Mayor Jim Kenney, the City of Philadelphia Budget Director, and the City of Philadelphia Treasurer. (Doc. No. 13-1 ¶ 87.)

to the Political Machine like her opponent, Mr. Butkovitz, who according to Ms. Rhynhart, neglected to audit the Philadelphia Parking Authority due to his "entrenched" interests.  (Id. ¶¶ 92-93.)

In connection with her statements about the Political Machine, Ms. Rhynhart emphasized that too many City of Philadelphia government jobs are given to unqualified applicants solely because they know people in power.  That practice, according to Ms. Rhynhart, hurts the City's operations and costs the City money.  (Id. ¶¶ 98-99.)  As a result, Ms. Rhynhart pledged that, if elected, she would only hire the best, most qualified applicants for the job.  (Id. ¶ 101.)  Notwithstanding that pledge, Ms. Rhynhart testified that she has "nothing against [hiring] someone who happens to have a friend or be related to someone, as long as they're the most qualified person for that job." (Doc. No. 13-8 at 19:6-10.)

Ms. Rhynhart did not receive much support from the City's Democratic Ward Leaders; according to her deposition, of the sixty-nine (69) Democratic Ward Leaders in Philadelphia, all but one endorsed Mr. Butkovitz in the Primary Election.  (Doc. No. 13-1 ¶ 11.)  Nevertheless, on May 16, 2017, Ms. Rhynhart defeated Mr. Butkovitz by winning the Democratic Primary.  (Id. ¶ 10.)  On November 6, 2017, Ms. Rhynhart prevailed in the General Election and was elected City Controller.  (Id. ¶ 12.)  During that election, Ms. Rhynhart was endorsed by all sixty-nine Democratic Ward Leaders.  (Id. ¶ 13.)

After winning the General Election, Ms. Rhynhart assembled a Transition Team to study the structure and staff of the Controller's Office (the "Office") and to evaluate what changes needed to be made to the Office before she was sworn-in as City Controller in January 2018.  (Id. ¶ 16.)  She also created a Transition Report to document her plan for the Office.  (Id. ¶ 15.)

The Transition Team included a Personnel Committee, which was tasked with determining the staffing needs of the Office under Ms. Rhynhart's control. The Personnel Committee was headed by Kellan White,[6] who was also the Director of the Transition Team, and Heather Steinmiller. Before working in the City Controller's Office, Mr. White worked on numerous political campaigns and served as the campaign manager for the committee to elect Ms. Rhynhart and the political director of Ms. Rhynhart's campaign. (Id. ¶ 104.) He is the son of John White, Jr., who is the former Ward Leader of the Democratic Party's 50th Ward and the former Pennsylvania Secretary of Welfare. (Id. ¶ 106.) According to Mr. White, he was the final decisionmaker ultimately responsible for the hiring and firing of the Office's employees. (Id. ¶¶ 19-22.) Although Ms. Rhynhart was the City Controller-elect, both she and Mr. White testified that she did not play a role in hiring or firing low-ranking members of the Office. (Id. ¶¶ 17-18.)

The Personnel Committee was charged with reorganizing the Office to promote efficiency and to reduce wasteful spending. According to Mr. White, this meant downsizing the number of exempt employees working in the Office. (Doc. No. 13-5 at 12:5-16, 50:3-11.) An exempt employee is a government employee that is exempt from civil service status. The majority of City of Philadelphia government jobs are governed by the City Civil Service System. As part of this system, applicants take the City's Civil Service Examination and are placed on an eligibility list according to their examination scores, credentials, and other factors. When a vacancy arises for a civil service position, the government must fill that position through the civil service eligibility list. A limited number of City of Philadelphia government jobs are exempt from the civil service system, meaning that the government does not need to hire from the civil

---

[6] Mr. White is not named as a Defendant in this action.

service eligibility list to fill that position.[7]  According to Mr. White, exempt employees are also at-will employees—that is, their employment can be terminated at any time at the discretion of their supervisor.  (Id. at 12:5-16.)

Prior to the General Election, there were forty-one (41) exempt employees working in the City Controller's Office.  Consistent with Ms. Rhynhart's stated goal of reducing the number of exempt employees in the Office, only sixteen (16) of those exempt employees were retained by the Rhynhart administration.  (Doc. No. 13-1 ¶¶ 34-35.)  Plaintiffs Frank Oliver, Lopez Jones, and Lisa Plaza were among the number of exempt employees that were not retained.

To restructure and downsize the Office, the Personnel Committee considered the resumes and cover letters of new applicants and existing employees.  (Doc. No. 13-5 at 12:8-16.)  The Personnel Committee also conferred with Office supervisors to discuss employees' performances.  These supervisors included Christy Brady, John Thomas, and Jeff Hornstein. (Doc. No. 13-1 ¶ 27.)  Additionally, the Personnel Committee worked with Harvey Rice, who had once served as First Deputy City Controller under Mr. Butkovitz.[8]  (Id. ¶ 26.)

Based on conversations with Mr. Rice and the current Office supervisors, the Personnel Committee developed a spreadsheet that reflected the supervisors' views on existing employees. (Id. ¶ 29; Doc. No. 13-13.)  This spreadsheet listed the employee's, position, current salary, and comments from supervisors.  Some of the comments noted whether the employee was politically connected.  (See Doc. No. 13.)

---

[7]  Alex Subers, Hiring and Employment in Philadelphia City Government, PEW (June 26, 2018), https://www.pewtrusts.org/research-and-analysis/reports/2018/06/26/hiring-and-employment-in-philadelphia-city-government.

[8]  It is unclear when Mr. Rice left the City Controller's Office, but according to Plaintiff Lisa Plaza's deposition, he "was gone for a couple years already" by 2017.  (Doc. No. 13-20 at 76:9-12.)

The Personnel Committee also created a separate spreadsheet that listed all candidates for positions in the Office, including all existing employees and all new applicants. (Doc. No. 13-1 ¶ 31; Doc. No. 13-14.) This spreadsheet listed each applicant's name, whether they were currently employed at the Office, and whether the Personnel Committee recommended that the applicant be interviewed. The spreadsheet also contained notes about certain applicants, including information about job history and whether the applicant was politically connected. (See Doc. No. 13-14.) According to this spreadsheet, the Personnel Committee did not recommend interviewing Plaintiffs for positions in the new administration. (Id.) During his deposition, Mr. White testified that Ms. Rhynhart was given these spreadsheets as they were updated in order to keep her apprised of the Personnel Committee's progress. (Doc. No. 13-5 at 48:18-22.)

As noted above, during the Transition Period, the Personnel Committee decided not to retain a number of exempt employees, including Plaintiffs Frank Oliver, Lopez Jones, and Lisa Plaza. According to Ms. Rhynhart and Mr. White, the decision to terminate Plaintiffs' employment was based on numerous factors, including Plaintiffs' credentials, supervisors' recommendations, and the need to restructure the Office. (Doc. No. 13-1 ¶ 102; Doc. No. 13-5 at 12:8-16.)

Although she was the City Controller-elect, Ms. Rhynhart testified that she did not play a role in firing low-ranking members of the Office like Mr. Oliver, Mr. Jones, or Ms. Plaza; rather, she only had a hand in hiring or firing "four or five high-ranking positions in the [O]ffice." (Doc. No. 13-1 ¶¶ 17-18.) Instead, Mr. White, the Chair of the Personnel Committee, had the final say as to whether the Office would retain the three Plaintiffs. Still, there is evidence that Ms. Rhynhart knew that the Personnel Committee had decided not to retain Plaintiffs. As noted

above, Ms. Rhynhart was sent the Personnel Committee spreadsheets, which listed whether the Committee recommended that an applicant be interviewed. In addition, Ms. Rhynhart was copied on a December 20, 2017 email from Mr. White to another member of the Transition Team, which contained a list of exempt employees, including Plaintiffs, that the Personnel Committee decided not to retain. (See Doc. No. 15 at 31.)

The background and termination of each Plaintiff follows.

### 1. Plaintiff Frank Oliver

Plaintiff Frank Oliver began working in the City Controller's Office in January 2008. (Doc. No. 13-1 ¶ 1.) Although he was initially hired as an investigator, he soon transitioned into working in the Office's Records Room. (Id. ¶ 39.) At the time of the General Election, Mr. Oliver considered himself to be the supervisor of the Records Room. In that capacity, he was responsible for assigning work to his three subordinates. (Id. ¶ 40.) Mr. Oliver was an exempt, at-will employee, meaning that he was exempt from civil service status and could be terminated at any time at the discretion of his supervisor. (Id. ¶¶ 4-5.)

Relevant here, Mr. Oliver is the son of Frank Oliver, Sr., who at the time of the 2017 Democratic Primary and the General Election, was the Treasurer of the Philadelphia County Democratic City Committee and the elected leader of the Philadelphia Democratic Party's 29th Ward.[9] (Id. ¶ 58.) Frank Oliver, Sr. also served in the Pennsylvania House of Representatives for thirty-seven (37) years. (Doc. No. 13-16 at 29:13-16.) Mr. Oliver's father did not support Ms. Rhynhart in the 2017 Democratic Primary for City Controller; instead, he endorsed Mr. Butkovitz, the incumbent. (Doc. No. 13-1 ¶ 59.) In her deposition, Ms. Rhynhart admitted that she considered Frank Oliver, Sr. to be a member of the Philadelphia Political Machine. (Doc. No. 13-8 at 12:5-14.)

---

[9] Frank Oliver, Sr. has since passed away.

8

On December 14, 2017, Mr. Oliver was informed via phone call that he would not be offered a position with the new administration and that his employment with the Office would end on January 2, 2018. (Doc. No. 13-1 ¶¶ 41-42.) On December 20, 2017, Mr. White sent Mr. Oliver a formal termination letter, which stated the following:

> Thank you for your interest in serving in the Controller's Officer under Controller-Elect Rhynhart. We wanted to provide in writing what was stated during our December 14, 2017 phone call. We have reviewed your resume and qualifications in the context of our plan for reorganization of the office, and unfortunately, we will be unable to offer you a position in the new administration. Accordingly, we have determined that you will be separated from City employment effective January 2, 2018.

(Doc. No. 13-18.) According to Mr. White, Mr. Oliver was not replaced; rather, his responsibilities have been consolidated and assigned to other employees in the Records Room. (Id. ¶ 43.)

In his deposition, Mr. Oliver testified that at first, he believed that he was not retained because Ms. Rhynhart "was going in a different direction." (Doc. No. 13-16 at 26:2-5.) But a few weeks after the termination, he read several newspaper articles that said "Frank Oliver, ward leader's son was terminated" and came to believe that he was fired due to his father's political activity. (Id. at 26:12-21.) Notwithstanding this belief, Mr. Oliver admits that he is unsure whether Ms. Rhynhart had anything to do with the decision to fire him. (Id. at 26:12-21.) In fact, he concedes that he has never met or spoken with Ms. Rhynhart; he also concedes that he is unsure whether Ms. Rhynhart knew his father or ever connected him with his father. (Id. at 30:7-20.) In addition, Mr. Oliver testified that he is not political and is not involved in local politics.

He voted for Mr. Butkovitz, but otherwise did not campaign for him due to his employment in the City Controller's Office.[10]  (Id. at 30:2-23, 43:1-16.)

Instead, Mr. Oliver thinks that the termination had something to do with Harvey Rice, the former First Deputy under Mr. Butkovitz, who consulted with the Personnel Committee during the Transition Committee and supported Ms. Rhynhart during her campaign for City Controller. (Id.)  According to Mr. Oliver, his father did not support Mr. Rice in an unsuccessful bid for political office a number of years earlier.  (Id. at 64:1-23.)  Additionally, while Mr. Rice was still working in the Office, he investigated Mr. Oliver for derogatory statements written on the wall in the men's bathroom.  Mr. Oliver testified that the investigation "felt like revenge . . . after [he] found out [his] father didn't support him . . . ."  (Id. at 49:2-5.)

According to Mr. White, Mr. Oliver was not retained because the Personnel Committee needed to downsize the Office by reducing the number of exempt employees and because Mr. Oliver's resume and credentials did not "make the cut."  (Doc. No. 13-5 at 10:1-8.)  Mr. White consulted with Mr. Rice about Mr. Oliver, but is not aware whether Mr. Rice harbored any animosity towards Mr. Oliver.  (Id. at 15:1-5.)

### 2.    Plaintiff Lopez Jones

Plaintiff Lopez Jones began working in the City Controller's Office in October 2006. (Doc. No. 13-1 ¶ 3.)  Mr. Jones' mother-in-law, Vivian Miller, is the former Ward Leader of the Democratic Party's 51st Ward and the former Clerk of Quarter Sessions in Philadelphia.[11]  (Id. ¶

---

[10] Section 10-107 of the Philadelphia Home Rule Charter restricts the political activity of City officers and employees.  Political activity refers to an activity that is directed toward the success or failure of a political party, candidate, or partisan political group. Phil. Home Rule Charter, Art. X, § 10-107.

[11] In the City of Philadelphia, the Clerk of Quarter Sessions was an elected position responsible for working with the state court system to accept posted bail, enter judgment upon forfeited bail, issue bench warrants, collect fines and costs imposed by the court, record bills of

62.)  According to his deposition, Mr. Jones was hired by the City Controller's Office in part because Ms. Miller spoke to Mr. Butkovitz, who was the City Controller at the time, on his behalf.  (Id. ¶¶ 63-64.)   The Personnel Committee spreadsheet that was developed from conversations with Office supervisors and senior staff notes Mr. Jones' connection to Ms. Miller:

> Mother in Law was formerly the Clerk of Quarter Sessions/Job Function was created by JT[12] at AB's[13] request would not be upset if he wasn't retained [sic]/ Job Function can be easily dispersed among Civil Service Workers.

(Doc. No. 13-13 at 1.)  This notation refers to comments from John Thomas, one of the senior staff, who told the Personnel Committee that Mr. Jones' position was created for him at Mr. Butkovitz's direction.  Mr. Thomas also told the Personnel Committee that Mr. Jones' position was unnecessary because his job responsibilities were repetitive of work already assigned to civil service employees.  (Doc. No. 13-1 ¶ 37.)  Both Mr. White and Ms. Rhynhart had access to this spreadsheet, which noted Mr. Jones' connection to Ms. Miller.

At the time of the 2017 General Election, Mr. Jones' job title was Contract Compliance Officer.  In that capacity, he was responsible for approving capital projects in Philadelphia.  (Id. ¶ 65.)  Like Mr. Oliver, Mr. Jones was an exempt, at-will employee, meaning that he was exempt from civil service status and that his position could be terminated at any time at the discretion of his supervisor.  (Id. ¶¶ 4-5.)

---

information or criminal transcripts, and answer inquiries from prisoners, attorneys, and other parties.  The position was abolished by Mayor Michael Nutter in 2010.  See Marcia Gelbert, Philadelphia abolishes Clerk of Quarter Sessions Office, Philadelphia Inquirer (Oct. 13, 2010),                                        https://www.inquirer.com/philly/news/local/20101013 _Philadelphia_abolishes_Clerk_of_Quarter_Sessions_Office.html.

[12] "JT" refers to John Thomas, one of the Office supervisors under Mr. Butkovitz who conferred with the Personnel Committee during the Transition Period.

[13] "AB" refers to Alan Butkovitz, the former City Controller.

At some point during the Transition Period, Mr. Jones was informed that his job was being terminated, effective January 2, 2018. (Id. ¶ 66.) He believes that he was fired because Ms. Miller was about to retire from her position as Ward Leader. (Id. ¶ 67.) On that subject, he stated the following:

> Question: Why do you believe you were not retained by Rebecca Rhynhart's Administration?
>
> Answer: I personally believe I was not retained because I was a part of the old guard, the old war heroes and things of that nature that lost their post around the time that Rebecca was getting hired or before.
>
> ***
>
> Question: So back to – you mentioned that you were part of the old regime?
>
> Answer: That's correct.
>
> Question: Okay. What do you mean by that?
>
> Answer: Meaning I feel as though I was fired because my mother-in-law was about to retire, she wasn't a ward leader anymore, and my work record, to my knowledge, I should not have gotten fired because I was there every day, I was the first person in the office every morning, so I could not for the life of me understand why they fired me.

(Doc. No. 13-19 at 5:21-6:1-3, 22:7-18.)

Mr. Jones is unsure whether Ms. Rhynhart knew that he was related to Ms. Miller, his mother-in-law, but he testified that he suspects that she knew about the connection:

> Question: Have you ever spoken with Rebecca R[h]ynhart?
>
> Answer: I have not.
>
> Question: Do you know if she knows – do you have any reason to believe that she knows who your mother-in-law is?
>
> Answer: I can't speak to who she may know, but I do believe she has an understanding that I was connected to the 51st ward.

| Question: | And what's your basis for making that statement? |
|---|---|
| Answer: | Because it seems like with my other co-workers that got fired, they were part of the old regime as well. Their sponsors, if you would, was [sic] about to retire or left and they got terminated just like I did. Mr. Oliver, his dad was retiring, he got fired. Lisa Plaza, her family members were about to leave the ward, they got fired. And we – the three of us was [sic] part of the old regime, which pertains to the ward leaders. |

(Id. at 24:3-23.) According Mr. Jones, Ward Leaders like his mother-in-law often "sponsor" individuals that want to get jobs in the City government. (Id. at 34:1-4.)

Mr. Jones also suspects his termination was connected to Harvey Rice, the former First Deputy City Controller under Mr. Butkovitz, who consulted with the Personnel Committee about restructuring the Office. Like Mr. Oliver, Mr. Jones was investigated by Mr. Rice when someone wrote derogatory statements on the wall in the men's bathroom in the Office. (Id. at 36:3-14.) According to Mr. Jones, no one was fired in connection with the derogatory statements, which left Mr. Rice "frustrated" with the Office. (Id. at 38:24-39:15.) Mr. Jones testified that Mr. Rice, who is politically active, knew that he was related to Vivian Miller. (Id. at 40:16-41:14.)

According to Mr. White, Mr. Jones was not retained because the Office needed to downsize by reducing exempt employees and because Mr. Jones' position was "repetitive[] and did not need to exist." (Doc. No. 13-5 at 39:10-13.)

### 3. Plaintiff Lisa Plaza

Plaintiff Lisa Plaza began working in the City Controller's Office on April 25, 2001. (Doc. No. 13-1 ¶ 3.) At the time of the 2017 General Election, she held the position of Contract Compliance Officer and served as an assistant to Plaintiff Lopez Jones. (Id.; Doc. No. 13-20 at 26:8-14.) According to her deposition, her job duties included making phone calls to verify minority participation in all City contracts, assisting with payroll, and working at the Office's

front desk and in the file room. (Doc. No. 13-1 ¶ 76.) Ms. Plaza was an at-will employee who was exempt from civil service status. (Id. ¶ 4.) One of the Personnel Committee's spreadsheets states the following about Ms. Plaza: "Out a lot[,] not a hard worker (JT)."[14] (Doc. No. 13-13 at 1.)

Like Mr. Oliver and Mr. Jones, Ms. Plaza is connected to leaders or former leaders of the City's Democratic Party. Her father, Carlos Matos, is the Ward Leader of the Democratic Party's 19th Ward. (Id. ¶ 77.) Her stepmother, Renee Tartaglione Matos, is a former Democratic Ward Leader and the former Deputy City Commissioner. Ms. Plaza describes her family as part of the "old regime." (Doc. No. 13-20 at 64:29-65:11.) In Ms. Rhynhart's deposition, she admitted that she considered Carlos Matos and Renee Tartaglione Matos to be part of the Philadelphia Political Machine. (Doc. No. 13-8 at 14:13-15:3.)

Ms. Plaza does not describe herself as political; she voted for Mr. Butkovitz, but otherwise did not campaign for him due to her employment with the City Controller's Office. (Doc. No. 13-20 at 34:2-20.) Despite her political connections, Ms. Plaza has never met Ms. Rhynhart. Nor does she know whether Ms. Rhynhart is aware that she is related to Mr. Matos or Ms. Tartaglione Matos. (Id. at 35:21-36:1.) None of the Personnel Committee spreadsheets note Ms. Plaza's political connections. (See Doc. Nos. 13-13, 13-14.) According to Ms. Plaza, Ms. Rhynhart requested a meeting with Mr. Matos and Ms. Tartaglione Matos, but she is unsure whether a meeting ever took place. (Doc. No. 13-20 at 36:8-24.)

On December 14, 2017, Ms. Plaza was notified via phone call that her employment in the Office had been terminated, effective January 2, 2018. (Doc. No. 13-1 ¶ 79; Doc. No. 13-21.) On December 20, 2017, Mr. White sent her a formal termination letter, which stated that after

---

[14] Again, "JT" refers to John Thomas, an Office supervisor under Mr. Butkovitz, who conferred with the Personnel Committee during the Transition Period.

reviewing her resume and qualifications, the Personnel Committee was not able to offer her a position due to "the context of our plan for reorganization of the office . . . ." (Doc. No. 13-21.) According to Mr. White, no one was hired to replace Ms. Plaza. (Doc. No. 13-1 ¶ 86.)

Ms. Plaza believes that her employment was terminated because she was often absent from work due to medical issues, and because she was soon going to be without a "sponsor." (Id. ¶ 80.) In her deposition, Ms. Plaza stated the following:

> Question: Is there any other reason that you believe that you were let go because of?
>
> Answer: The main reason was – the main reason that I believe was because I was going to be without a sponsor.
>
> Question: And what does that mean?
>
> Answer: To me, that meant my stepmom was having legal problems,[15] so she already had resigned from the commissioner's office when Rebecca took office, but you know, she comes from a very political family. Tina was still a Senator.[16] I just – I believe more so it was because of all the time I was missing and my medical condition.
>
> ***
>
> I had heard during her campaign that she – I honestly didn't even believe that she was going to win. I don't think any of us. We were all blindsided. But I heard that she was – during her campaign, she was talking about doing away with the Political Machine.

(Doc. No. 13-20 at 31:23-33:9.)

Additionally, Ms. Plaza believes that Harvey Rice influenced the decision to terminate her. According to Ms. Plaza, Mr. Rice was particularly hard on her when he served as First

---

[15] On June 23, 2017, a jury found Renee Tartaglione Matos guilty on fifty-three (53) counts charging several federal offenses. See United States v. Tartaglione, Crim. No. 15-491, Doc. No. 148 (E.D. Pa., filed Oct. 13, 2015).

[16] Christine "Tina" Tartaglione, Renee Tartaglione Matos' sister, is a member of the Pennsylvania Senate. (See Doc. No. 13-20 at 76:19-77:2.)

Deputy City Controller.  (Id. at 38:14-39:18.)  She testified that at one point, Mr. Rice referenced her father and stepmother during an argument that they had in the Office.  (Id. at 39:19-40:15.)  She also mentioned that several years ago, Mr. Rice had unsuccessfully run against her stepmother's sister, Christine Tartaglione, for State Senator.  (Id. at 77:14-20.)  Once she learned that Mr. Rice was involved in Ms. Rhynhart's campaign and the transition process, she feared that she would lose her job.  (Id. at 41:15-23.)

According to Mr. White, Ms. Plaza was not retained because the Personnel Committee needed to downsize the Office by reducing the number of exempt employees.  (See Doc. No. 13-5.)

### B.   Procedural History

After the Personnel Committee terminated their employment, the three Plaintiffs filed separate Complaints against Ms. Rhynhart in federal court, which, as noted, were then consolidated into the present action.  (See Doc. Nos. 13-2, 13-3, 13-4.)   Plaintiffs claim, pursuant to 42 U.S.C. § 1983, that Ms. Rhynhart violated their First Amendment rights by terminating their employment due to political affiliation.  In essence, Plaintiffs allege that they lost their jobs with the City Controller's Office because they are related to individuals who are a part of the "Political Machine," which they claim is an identifiable faction within the Democratic Party of the City of Philadelphia.

## III.   STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.   Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that

the moving party is entitled to judgment as a matter of law." <u>Favata v. Seidel</u>, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting <u>Azur v. Chase Bank, USA, Nat'l Ass'n</u>, 601 F.3d 212, 216 (3d Cir. 2010)). A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. <u>Kaucher v. County of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). For a fact to be considered "material," it "must have the potential to alter the outcome of the case." <u>Favata</u>, 511 Fed App'x at 158. Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." <u>Id.</u> (quoting <u>Azur</u>, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Id.</u> (alteration in original) (quoting <u>Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.</u>, 587 F.3d 176, 181 (3d Cir. 2009)). The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. <u>Anderson</u>, 477 U.S. at 247–249. Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the nonmoving party's evidence over that presented by the moving party. <u>Id.</u> at 255. If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. <u>Id.</u> at 250.

## IV.     ANALYSIS

Ms. Rhynhart advances two arguments in support of her Motion for Summary Judgment. First, she submits that Plaintiffs have failed to produce evidence to establish a prima facie case of discrimination as a result of political association. Second, she argues that she is entitled to

judgment as a matter of law under the doctrine of qualified immunity.  For these reasons, Ms. Rhynhart asks the Court to enter judgment in her favor.  (See Doc. No. 13.)

Conversely, Plaintiffs contend that the record is replete with genuine issues of material fact as to whether Ms. Rhynhart fired them because of their political affiliation, in violation of the First Amendment.  As a result, Plaintiffs request that the Court deny the Motion for Summary Judgment and afford them their day in Court.  (See Doc. No. 14.)  For the reasons given below, Ms. Rhynhart's Motion for Summary Judgment (Doc. No. 13) will be granted and judgment will be entered in her favor.

**A. Plaintiffs Have Not Produced Evidence from which a Reasonable Jury Could Conclude that They Were Fired Based on Their Political Affiliation**

Plaintiffs each allege that Ms. Rhynhart terminated their employment with the City Controller's Office because they are affiliated with members of the "Old Guard" or the "Political Machine."  (See Doc. Nos. 13-2, 13-3, 13-4.)  In essence, they argue that the decision to fire them constitutes discrimination due to political affiliation, in violation of their rights under the First Amendment to the United States Constitution, as applied to the States by the Fourteenth Amendment.

Plaintiffs bring their claims pursuant to 42 U.S.C. § 1983 ("Section 1983").  Importantly, Section 1983 does not create substantive rights.  Instead, Section 1983 is a statutory mechanism that allows persons to seek review of alleged state and local violations of federal law in federal court.  In fact, the purpose of the statute "was to interpose the federal courts between the States and the people, as guardians of the people's federal rights . . . ."  Mitchum v Foster, 407 U.S. 225, 242 (1972).

In general, courts have held that terminating a public employee because of his or her political association violates the First Amendment.  See Branti v. Finkel, 445 U.S. 507, 519-520

(1980) (holding that the termination of public employees based on political association violates the First Amendment unless the position at issue involves policymaking); Elrod v. Burns, 427 U.S. 347, 359 (1976) (finding that conditioning public employment on support for a political party or politician inhibits the rights guaranteed by the First Amendment). To state a prima facie claim of discrimination due to political association, a plaintiff must establish three elements: (1) that he was employed by a public agency in a position that does not require political affiliation; (2) that he engaged in constitutionally protected conduct by maintaining an affiliation with a political party; and (3) that this protected conduct was a substantial or motivating factor in the government's employment decision. Galli v. New Jersey Meadowlands Commission, 490 F.3d 265, 270 (3d Cir. 2007). Satisfying the third prong requires proof that the employer knew of the plaintiff's political affiliation and that the affiliation caused the adverse employment action. Id. at 275. If the plaintiff establishes a prima facie face, "the burden shifts to the employer to prove 'by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity.'" McKeever v. Township of Washington, 473 Fed. App'x 103, 104 (3d Cir. 2012) (quoting Galli, 490 F.3d at 271).

In her Motion for Summary Judgment, Ms. Rhynhart concedes that Plaintiffs were employed by a public agency in positions that do not require political affiliation. (Doc. No. 13 at 6 n.1.) What she does not concede is that Plaintiffs have demonstrated that (1) they were engaged in constitutionally protected conduct, and (2) this protected conduct was a substantial or motivating factor in the decision to terminate their employment with the City Controller's Office. (Id. at 4.) She also argues that Plaintiffs have not produced evidence of her personal involvement in the termination decisions, as required by Section 1983. (Id.) The Court will address these arguments in turn.

## 1. Plaintiffs Have Not Demonstrated that They Engaged in Constitutionally Protected Political Conduct

The second element of a political affiliation claim requires that a plaintiff demonstrate that he engaged in constitutionally protected conduct by maintaining an affiliation with a political party. In addressing this element, courts have made clear that a political affiliation claim is not limited to a situation where an employee belongs to a different political party than his supervisor. Instead, "the protection of the expression or exercise of political beliefs enjoys no less protection when the expression or exercise results in an employee supporting a different faction with the same party . . . ." Savage v. Pennsylvania Turnpike Commission, No. 15-6501, 2018 WL 2670037, at *27 (E.D. Pa. June 1, 2018) (citing Robertson v. Fiore, 62 F.3d 596, 600 (3d Cir. 1995)). In Robertson, the Third Circuit explained as follows:

> The danger that employees will abandon the expression or exercise of their political beliefs to appease their supervisors is not diminished because a supervisor supports a different identifiable faction within a party as compared to a different party altogether. Whenever an employee, whose position does not require political decision making, yields his political will to his supervisor, the political process is harmed whether the employee is of the same or a different party.

Robertson, 62 F.3d at 600 (internal citations omitted). Thus, the court concluded that "[w]here . . . a public employee is associated with an identifiable political faction within a single party, we need not be concerned that his activities were not legitimately political or legitimately divisive." Id.

Ms. Rhynhart acknowledges this precedent, but contends that Plaintiffs are not affiliated with an identifiable political faction. Plaintiffs disagree. They contend that as relatives of members of the Political Machine, they are affiliated with an identifiable political faction. To evaluate these arguments, the Court must determine (1) whether the Political Machine is an

identifiable political faction, and (2) whether merely being a child or relative of a member of the Political Machine constitutes political affiliation.

As an initial matter, the record supports a finding that the Political Machine is an identifiable faction of the Democratic Party of the City of Philadelphia. For one, Ms. Rhynhart has identified it as such. Throughout her campaign for City Controller, she repeatedly vowed to oppose the Political Machine and rebuke the status quo put in place by entrenched powers within the City. She confirmed this opinion in her deposition. Although she testified that the Political Machine is not about individual people or Ward Leaders, she admitted that she considered Plaintiffs' relatives—Frank Oliver, Sr., Vivian Miller, Carlos Matos, and Renee Tartaglione Matos—to be members of the Political Machine, which did not support her during the 2017 Democratic Primary.

Notwithstanding this conclusion, the Court is not persuaded that an individual engages in constitutionally protected political conduct simply by virtue of being related to someone who engages in constitutionally protected political conduct. As noted above, the First Amendment protects an employee's failure to support a winning candidate, as well as an employee's failure to engage in political activity. See Galli, 409 F.3d at 272-73. But here, Plaintiffs do not argue that they were terminated because they failed to support Ms. Rhynhart or because they failed to engage in political activity.[17] Rather, they contend that they were terminated because their relatives are members of the Political Machine. Their claims are in no way based on their own conduct, or lack thereof; instead, the claims rest entirely on the political conduct of their family members.

---

[17] In fact, they admit that they are not political and that their positions with the City Controller's Office prohibited them from campaigning.

The Court has found no case law to support Plaintiffs' theory. Nor have Plaintiffs pointed the Court in the direction of any legal authority that explains or justifies their position. To the contrary, courts have found that a plaintiff engaged in constitutionally protected activity only where the evidence relates to the plaintiff's conduct. See Wheeler v. Township of Edison, 326 Fed. App'x 118, 121 (3d Cir. 2009) (finding that the plaintiff's decision to support the mayor's political opponents amounted to constitutionally protected conduct); Best v. Housing Authority, 61 F. Supp. 3d 465, 472 n.10 (D.N.J. 2014) (explaining that although "merely being related" to a supervisor's political opponent "is insufficient to constitute political activity," the plaintiff demonstrated political affiliation by producing evidence that he supported his supervisor's political opponent).

In short, although Plaintiffs' relatives are members of an identifiable political faction, merely being related to a member of an identifiable political faction is not protected by the First Amendment. To hold otherwise would be tantamount to allowing a person to assert someone else's First Amendment rights as their own. Consequently, Plaintiff has failed to plead a prima facie case of discrimination based on political affiliation.

2. **Plaintiffs Have Not Established that Their Alleged Political Affiliation was a Substantial or Motivating Factor in the Decision to Terminate Their Employment with the City Controller's Office**

Even if Plaintiffs had established the second prong of a political association claim, they have not marshaled sufficient evidence to satisfy the third prong. As noted above, the third prong of a political association claim requires that a plaintiff produce evidence from which a reasonable jury could conclude that his political activity was a substantial or motivating factor in the decision to terminate his employment. Galli, 490 F.3d at 270. "Implicit in this prong are two requirements; a plaintiff must produce evidence to show that defendants had knowledge of his

political affiliation in addition to demonstrating causation." <u>Wheeler</u>, 326 Fed. App'x at 121-22 (citing <u>Stephens v. Kerrigan</u>, 122 F.3d 171, 176 (3d Cir. 1997)).

"Proof of knowledge can come from direct or circumstantial evidence." <u>Goodman v. Pa. Turnpike Comm'n</u>, 293 F.3d 655, 664 (3d Cir. 2002). Here, there exists limited circumstantial evidence that Ms. Rhynhart was aware that Plaintiffs were related to members of the Political Machine. This evidence comes in the form of Harvey Rice, the Former First Deputy City Controller under Mr. Butkovitz, who consulted with the Personnel Committee during the Transition Period. In their depositions, the three Plaintiffs testified that Mr. Rice knew that they were related to members of the Political Machine. Because Mr. Rice conferred with the Personnel Committee about the structure of the Office, it is reasonable to infer that Mr. Rice informed Ms. Rhynhart and the Personnel Committee that Plaintiffs had politically active relatives. Although this evidence is weak support for Plaintiffs' contentions, the Court is mindful that it must view the facts in the light most favorable to the non-movants, which in this case, are Plaintiffs.

Further, Mr. White, the head of the Personnel Committee, is an active member of the Philadelphia Democratic Party. As noted earlier, before working on Ms. Rhynhart's campaign, Mr. White worked on numerous political campaigns and was elected the President of the Philadelphia Young Democrats. In addition, Mr. White's father is the former Pennsylvania Secretary of Welfare and a former Democratic Ward Leader. (Doc. No. 13-1 ¶¶ 104-106.) Based on his heavy involvement in City politics, it is reasonable to infer that Mr. White knew that Plaintiffs were related to City Ward Leaders and conveyed that information to Ms. Rhynhart. <u>See</u> <u>Goodman</u>, 293 F.3d at 672 (finding that it was not plausible that politically active members of a personnel committee did not know about the plaintiff's extensive political activity).

Finally, one of the Personnel Committee spreadsheets noted that Mr. Jones is related to Vivian Miller, a former Ward Leader and the former Clerk of Quarter Sessions. As the head of the Personnel Committee, Mr. White would have seen this notation. Additionally, Mr. White testified that Ms. Rhynhart had access to this spreadsheet. Based on these pieces of evidence, there exists a genuine issue of material fact as to whether Ms. Rhynhart and the Personnel Committee knew that Plaintiffs were related to members of the Political Machine.

Nevertheless, Plaintiffs have not produced any evidence that establishes that their connection to members of the Political Machine was a substantial or motivating factor in the decision to terminate them. To the contrary, there exists significant evidence that Plaintiffs would have been terminated regardless of their political affiliation. As noted above, Ms. Rhynhart repeatedly stated throughout her campaign that she planned to downsize the Office by reducing the number of exempt employees in order to cut unnecessary spending. In accordance with that goal, the Personnel Committee decided to terminate a number of exempt employees, including Plaintiffs, whose resumes and credentials did not support retention. Prior to the General Election, there were forty-one (41) exempt employees working in the City Controller's Office. Only sixteen (16) of those exempt employees were retained by the Rhynhart administration. (Doc. No. 13-1 ¶¶ 34-35.)

In her deposition, Ms. Plaza admits she believes that she was not retained because she often missed work due to medical issues. (Doc. No. 13-20 at 30-32.) One of the Personnel Committee spreadsheets supported that belief—that spreadsheet did not note her political connections, but instead listed that Ms. Plaza was "out a lot" and "not a hard worker." (Doc. No. 13-13 at 1.) No one was hired to replace Ms. Plaza.

Turning to Mr. Jones, the evidence demonstrates that he was not retained because the Personnel Committee determined that his position was not necessary. Indeed, Mr. Thomas, one of the Office's supervisors, informed the Personnel Committee that Mr. Butkovitz, the former City Controller, created an unnecessary position in the Office in order to give Mr. Jones a job at Vivian Miller's request. According to Mr. Thomas, Mr. Jones' job duties were duplicative of work already being completed by civil service employees in the Office. Consequently, the Personnel Committee decided to not retain him. No one was hired to replace Mr. Jones.

Finally, there is substantial evidence in the record that Mr. Oliver's position at the City Controller's Office was unnecessary. At the time he was employed by the City Controller's Office, four employees, including Mr. Oliver, worked in the Records Room. Now, that same work is being completed by three employees. No one was hired to replace Mr. Oliver, but the same amount of work is being accomplished. Based on this evidence, it is clear that Mr. Oliver's position was not necessary.

From these facts, no reasonable jury could conclude that Plaintiffs' connection to members of the Political Machine was a substantial or motivating factor in the decision to terminate their employment. As a result, Plaintiffs have not established the third prong of a political affiliation claim. Thus, for this additional reason, Ms. Rhynhart is entitled to summary judgment.

### 3. Plaintiffs Have Not Demonstrated that Ms. Rhynhart was Personally Involved in the Decision to Terminate Their Employment

Next, Ms. Rhynhart argues that she cannot be held liable because she was not personally involved in the termination decisions. (Doc. No. 13 at 7.)

In Section 1983 claims, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of <u>respondeat superior</u>." <u>Argueta v.</u>

U.S. Immigrations & Customs Enf't, 643 F.3d 60, 71 (3d Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)).  Thus, to hold a government official liable under Section 1983, a plaintiff must produce evidence that the government official, through her own actions, violated the plaintiff's rights.  "'The government official must have had some sort of personal involvement in the alleged unconstitutional conduct.'"  Acosta v. Democratic City Committee, 288 F. Supp. 3d 597, 636 (E.D. Pa. 2018) (quoting Argueta, 643 F.3d at 71).

A government official can be liable for the acts of her subordinates in two ways.  First, "personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."  Argueta, 643 F.3d at 72 (quoting Rode v. Dellarcipete, 845 F.2d 1195, 1207 (3d Cir. 1988)). To demonstrate acquiescence, a plaintiff must show that the official "contemporaneously [knew] of the violation of a plaintiff's rights and fail[ed] to take action."  Anderson v. City of Philadelphia, No. 16-5717, 2017 WL 55087, at *4 (E.D. Pa. Feb. 10, 2017) (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3d Cir. 1997)).

Second, an official can be held liable under Section 1983 if she "implements a policy or practice that creates an unreasonable risk of a constitutional violation on the part of the subordinate and the [official's] failure to change the policy or employ corrective practices is a cause of this unconstitutional conduct."  Argueta, 643 F.3d at 72 (citing Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001)).

Here, the record is completely devoid of any evidence to suggest that Ms. Rhynhart was personally involved in the decision to fire Plaintiffs.  According to both Ms. Rhynhart and Mr. White, Ms. Rhynhart was only involved in the decision to hire or fire a few key, high-level employees; she did not participate in the hiring or firing of low-level employees like Plaintiffs Oliver, Jones, or Plaza.  Instead, that duty was relegated to Mr. White and the Personnel

Committee.  It is undisputed that Mr. White was the final decisionmaker with respect to Plaintiffs' employment in the Office.  Although Mr. White kept Ms. Rhynhart abreast of which employees would not be retained, he only informed Ms. Rhynhart of his employment decisions after they had been made.

Plaintiffs contend that that Ms. Rhynhart was personally involved with these decisions because she drafted rough organizational charts to demonstrate to the Transition Team and the Personnel Committee how the Office should be restructured.  But these organizational charts in no way show that Ms. Rhynhart directed her subordinates to violate Plaintiffs' rights.  Instead, they are evidence of legitimate efforts to reorganize the Office, which was her prerogative as City Controller-elect.

Plaintiffs also contend that Ms. Rhynhart's campaign pledge to downsize and diversify the Office links Ms. Rhynhart to the alleged violation of their rights.  But there is no evidence to support this contention.   As noted above, during the campaign, Ms. Rhynhart "pledged to audit every City department, save the City money by focusing on best practices and modernization, commission an outside audit of the Controller's Officer to ensure the office is operating efficiently, improve the pension fund's return on investment, increase the diversity of the city's workforce, audit the Philadelphia Parking Authority, and increase transparency in city government."  (Doc. No. 13-1 ¶ 9.)  Nowhere in these campaign pledges are directions or encouragement to fire employees in violation of the First Amendment

Thus, Plaintiffs have not produced any evidence from which a reasonable jury could conclude that Ms. Rhynhart was personally involved in the alleged violation of Plaintiffs' constitutional rights.  Plaintiffs have not shown that Ms. Rhynhart knew about the violations,

directed the violations, or instituted a policy that led to violations. Consequently, for this additional reason, Ms. Rhynhart is entitled to judgment as a matter of law.

### B. Ms. Rhynhart Has Demonstrated that She is Entitled to Qualified Immunity

Finally, Ms. Rhynhart claims that she is entitled to judgment as a matter of law under the doctrine of qualified immunity. (Doc. No. 13 at 15.) "The doctrine of qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Baloga v. Pittston Area School District, 927 F.3d 742, 762 (3d Cir. 2019) (quoting Miller v. Clinton Cty., 544 F.3d 542, 547 (3d Cir. 2008)). "This analysis is guided by two questions: (1) did the government actor violate a constitutional right? and (2) was that right 'clearly established' at the time of the challenged conduct?" Id. (citing Dougherty v. Sch. Dist. of Phila., 772 F.3d 979, 986 (3d Cir. 2014)). For a right to be clearly established, "there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited." Mammaro v. N.J. Div. of Child Prot. & Permanency, 814 F.3d 164, 169 (3d Cir. 2016) (internal citation omitted).

Before determining whether the constitutional right relied upon by Plaintiffs is clearly established, the Court must first "frame the precise contours of that right." Spady v. Bethlehem Area School Distr., 800 F.3d 633, 638 (3d Cir. 2015). It is well-established that courts are "not to define clearly established law at a high level of generality." Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011). Instead, courts "must define the right allegedly violated at the appropriate level of specificity." Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012). Considering an overly broad version of a right "would . . . convert the rule of qualified immunity that our cases plainly

establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Spady, 800 F.3d at 638 (quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987)). Thus, the Court must frame right at issue "in a more particularized, and hence more relevant, sense," Anderson, 483 U.S. at 640, "in light of the case's specific context, not as a broad general proposition." Spady, 800 F.3d at 638 (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).

In this case, Plaintiffs' claims are derived from the First Amendment to the United States Constitution, which provides that:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. I. In a broad sense, Plaintiffs argue that this case implicates their First Amendment right to political affiliation, which is a form of free speech. More specifically, they contend that the First Amendment protects their right to be related to individuals who engage in constitutionally protected political activity. Thus, for the purposes of qualified immunity, the question is whether the law in this context is so well-established that it would have been apparent to a reasonable employer that terminating an employee who engages in no political conduct, but is related to someone who does engage in political conduct, violates the employee's First Amendment right to political affiliation.

Here, Ms. Rhynhart is entitled to qualified immunity because Plaintiffs have not demonstrated that the decision to terminate them violated a clearly established constitutional right. There is no clearly established constitutional right to employment simply because the employee is related to someone who engaged in political conduct. As noted above, the Court has found no case law to support the theory that merely being related to a politically active individual

is protected by the First Amendment.  See Best, 61 F. Supp. 3d at 472 n.10 (explaining that "merely being related" to a supervisor's political opponent is insufficient to show constitutionally protected political conduct).  Consequently, there is neither evidentiary nor legal support for the contention that the decision to terminate Plaintiffs violated a clearly established constitutional right.  As a result, the doctrine of qualified immunity bars this suit.

In sum, Plaintiffs have not produced evidence that creates a genuine issue of material fact as to whether Ms. Rhynhart terminated their employment based on their political affiliation, in violation of the First Amendment.  Additionally, Ms. Rhynhart has demonstrated that she is entitled to qualified immunity in this case.  For these reasons, Ms. Rhynhart is entitled to judgment as a matter of law.

## V.    CONCLUSION

For the foregoing reasons, Defendant Rebecca Rhynhart's Motion for Summary Judgment (Doc. No. 13) will be granted, and judgment will be entered in her favor.  An appropriate Order follows.